1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11   BARRY KING,                          Case No. 1:20-cv-00943-CDB  (PC)

12              Plaintiff,                 **ORDER GRANTING IN PART**
                                           **DEFENDANTS' MOTION FOR**
13        v.                               **SUMMARY JUDGMENT**

14   NAPHCARE, INC. ET AL.,                **ORDER DENYING PLAINTIFF'S**
                                           **MOTION FOR SUMMARY JUDGMENT**
15              Defendants.
                                           (ECF Nos. 61, 62)
16

17

18                                **I.  INTRODUCTION**

19        Plaintiff Barry King ("King") filed the operative complaint in this case on July 7, 2020, in

20   which he alleges that Defendants violated the Constitution and federal law in connection with

21   treating him for injuries he sustained following his involvement in a high-speed vehicle chase

22   with law enforcement on July 13, 2018.  Following entry of stipulated orders to dismiss certain

23   parties and claims (*see* ECF Nos. 19, 40), what remains is (1) King's second cause of action

24   alleging that Defendants Nurse Practitioner Robynn Weston ("NP Weston"), Dr. Naeem Siddiqi

25   ("Dr. Siddiqi") and their employer/agent Naphcare, Inc. ("Naphcare") were deliberately

26   indifferent to King's serious medical needs under the Fourteenth Amendment and 42 U.S.C §

27   1983, and (2) King's fourth cause of action asserting a claim against Naphcare for municipal and

28   supervisory liability under *Monell v. Dep't of Soc. Srvcs. of City of New York*, 436 U.S. 658

1    (1978).  (ECF No. 1).

2          On April 22, 2022, the parties filed cross-motions for summary judgment on both claims.

3    (ECF Nos. 61, 62).  The parties filed oppositions to the competing motions on June 13, 2022,

4    (ECF Nos. 64, 65) and replies on June 20, 2022. (ECF Nos. 69, 70).  Upon review of the fully

5    briefed motions and the record in the case, and for the reasons set forth below, the Court grants

6    Defendants' motion in part and denies King's motion in full.

7                              **II.  APPLICABLE LAW**

8          Summary judgment is appropriate where there is "no genuine dispute as to any material

9    fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Washington*

10   *Mutual Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011).  An issue of fact is genuine

11   only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party,

12   while a fact is material if it "might affect the outcome of the suit under the governing law."

13   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.*, 818

14   F.2d 1422, 1436 (9th Cir. 1987).

15         Each party's position must be supported by: (1) citing to particular portions of materials in

16   the record, including but not limited to depositions, documents, declarations, or discovery; or

17   (2) showing that the materials cited do not establish the presence or absence of a genuine dispute

18   or that the opposing party cannot produce admissible evidence to support the fact.  *See* Fed. R.

19   Civ. P. 56(c)(1).  The court may consider other materials in the record not cited to by the parties,

20   but it is not required to do so.  *See* Fed. R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified*

21   *School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) (on summary judgment, "the court has

22   discretion in appropriate circumstances to consider other materials, [but] it need not do so").

23   Furthermore, "[a]t summary judgment, a party does not necessarily have to produce evidence in a

24   form that would be admissible at trial."  *Nevada Dep't of Corr v. Greene*, 648 F.3d 1014, 1019

25   (9th Cir. 2011) (citations and internal quotations omitted).  The focus is on the admissibility of

26   the evidence's contents rather than its form.  *Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374

27   F.3d 840, 846 (9th Cir. 2004).

28         "The moving party initially bears the burden of proving the absence of a genuine issue of

material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett,* 477 U.S. at 317, 323 (1986)).   To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).   If the moving party meets this initial burden, the burden then shifts to the non-moving party "to designate specific facts demonstrating the existence of genuine issues for trial." *In re Oracle Corp. Sec. Litig.*, 627 F.3d at 387 (citing *Celotex Corp.,* 477 U.S. at 323).   The non-moving party must "show more than the mere existence of a scintilla of evidence." *Id.* (citing *Anderson,* 477 U.S. at 252).   However, the non-moving party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Electrical Serv., Inc. v. Pac. Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987).

The court must apply standards consistent with Rule 56 to determine whether the moving party has demonstrated the absence of any genuine issue of material fact and that judgment is appropriate as a matter of law. *See Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993). "[A] court ruling on a motion for summary judgment may not engage in credibility determinations or the weighing of evidence." *Manley v. Rowley,* 847 F.3d 705, 711 (9th Cir. 2017) (citation omitted).   The evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party. *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 772 (9th Cir. 2002); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

In addition, when the parties submit cross-motions for summary judgment, as they have done here – each motion must be considered on its own merits. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).   The Ninth Circuit has held:

> It is well-settled in this circuit and others that the filing of cross-motions for summary judgment, both parties asserting that there are

1

2
no uncontested issues of material fact, does not vitiate the court's
responsibility to determine whether disputed issues of material fact
are present. A summary judgment cannot be granted if a genuine
issue as to any material fact exists.

3

4  (*Id.*) (quoting *United States v. Fred A. Arnold, Inc.*, 573 F.3d 605, 606 (9th Cir. 1978)).  The

5  Court has a responsibility to determine whether the record holds a genuine issue of material fact,

6  even in cases where both parties believe that there are no material fact issues.  (*Id.*)  Accordingly,

7  the Court will address each party's grounds for summary judgment and decide whether the facts

8  conclusively establish liability or the lack thereof for each party. If the record supports a genuine

9  dispute of material fact, then summary judgment shall be denied.

10  ### III.  STATEMENT OF FACTS

11  **A.      Undisputed Statement of Material Facts**

12       The parties' Joint Statement of Undisputed Facts ("JSUF") sets forth the agreed-upon

13  facts for the purposes of the summary judgment motions.  (ECF 62-3 or "JSUF").

14       Defendants largely rely on the JSUF in support for their motion for summary judgment.

15  (*see* ECF No. 61-1, pp. 6-16).[1]  On July 13, 2017, King led law enforcement on a high-speed

16  chase into a residential neighborhood.  As King was fleeing from the police, an officer rammed

17  his vehicle into the stolen vehicle that King was driving.  Either the collision or law

18  enforcement's subsequent conduct caused King to sustain acute comminuted left mandibular

19  parasymphyseal and ramus fractures (jaw fractures).  (JSUF ¶ 1).

20       After King was apprehended, he was taken to Adventist Health Medical Center.  (*Id.* ¶ 2).

21  King underwent a CT scan of his facial bones which showed acute jaw fractures.  King's treating

22  physician, Dr. Timothy Bullard ("Dr. Bullard"), an emergency medicine physician, consulted

23  with Dr. Don Setliff, an otolaryngologist, at the CRMC Oral Surgery Clinic.  (*Id.*).  The physician

24  at the CRMC Oral Surgery Clinic recommended King follow-up in the clinic as an outpatient.

25  King was discharged to police custody.  (*Id.*)  The discharge instruction indicated that King

26  needed an appointment at the oral surgery clinic within four to five days.

27       When King arrived at the Kings County Jail, he was screened by Alan Aguilar

28

---

[1] Record citations herein are to the CM/ECF-assigned pages.

4

("Aguilar"), a registered nurse employed by Naphcare.  (*Id.* ¶ 3).  Naphcare was contracted by Kings County to provide, manage, arrange for, and facilitate all medical, dental, and behavioral healthcare required by patients in the Kings County Jail.  (*Id.* ¶ 42).  Aguilar described some of the injuries King sustained and informed Stephanie Gaitan ("Gaitan"), an administrative assistant employed by Naphcare, that King needed to be referred to the CRMC Oral Surgery Clinic within three to five days.  Aguilar's physical assessment of King was reviewed by Naphcare's nurse practitioner, NP Weston, on July 16, 2018.  (*Id.* ¶ 3).

On July 14, 2018, King was seen by Defendant Dr. Naeem Siddiqi ("Dr. Siddiqi"), Naphcare's on-site Medical Director. (*Id.* ¶ 4).  Dr. Siddiqi is also an internal medicine physician and obstetrician/gynecologist.  (*Id.*).  Dr. Siddiqi noted that King sustained an acute comminuted left mandibular parasymphyseal and ramus fracture and assessed King had a left mandibular fracture.  He prescribed cephalexin, Tylenol #3, twice a day; ibuprofen 600 mg tablets, twice a day; and clonidine 0.2 mg, once a day.  Dr. Siddiqi planned for King to be seen at the CRMC Oral Surgery Clinic. (*Id.*).

That same day, Dr. Siddiqi completed an offsite healthcare authorization. (*Id.* ¶ 5).  Dr. Siddiqi ordered King to be seen by an oral surgeon at the CRMC Oral Surgery Clinic on an urgent basis.  NP Weston ordered King to consume a liquid diet.  (*Id.*).

At the same time, Gaitan submitted a request to Naphcare corporate for an urgent referral to an oral surgeon.  (*Id.* ¶ 6).  The referral was approved on July 17, 2018.  When Naphcare staff contacted the CRMC Oral Surgery Clinic (not later than July 23, 2018), an appointment for oral surgery consultation was set for August 27, 2018. (*Id.*)

According to Susan Thorn, CRMC Oral Surgery Clinic's representative, King's circumstances were communicated to their physician team. The CRMC Oral Surgery Clinic scheduled King's appointment with his circumstances in mind. (*Id.* ¶ 7).

On July 24, 2018, NP Weston's order for a liquid diet expired, and she ordered a soft diet instead.  (*Id.* ¶ 8). King submitted a request for medical care. He indicated that did not want to be switched to a soft diet, as he was unable to chew anything.  (*Id.*).  NP Weston prescribed Tylenol #3, twice a day, and ibuprofen.  King was not placed back on a liquid diet.  (*Id.*).

On July 27, 2018, nurse Yvonne De La Cruz, a licensed vocational nurse, noted that King was able to speak, swallow, and eat meals without complications, although King now declares that he was unable to eat his meals for several weeks after the liquid diet expired.  (*Id.* ¶ 9).

King submitted a request for medical care on August 4, 2018.  The request read: "The only one Tylenol [#3] I'm getting still leaves me with a headache, my jaw feels like its locked up. But nothing you've been giving me has been able to deal with the exposed nerve." (*Id.* ¶ 10).

On August 5, 2018, Dr. Siddiqi saw King and noted he was able to talk and eat, although King declares that he was unable to eat his meals for several weeks after the liquid diet expired. The request for an offsite consultation had been processed and they were waiting for an appointment. (*Id.* ¶ 11).  King's Tylenol #3 prescription was discontinued, and he started to take ibuprofen instead.

On August 27, 2018, King was taken to his scheduled appointment at the CRMC Oral Surgery Clinic.  (*Id.* ¶ 13).  The oral surgeon who saw him planned to perform surgery — an open reduction and internal fixation ("ORIF") of the bilateral mandible fractures with maxillomandibular fixation via intraoral or extraoral approaches.  The oral surgeon also planned to extract tooth #21, as well as any other necessary teeth. (*Id.*)

On August 28, 2018, NP Weston submitted an offsite healthcare authorization form to Naphcare, which contained a request for approval of surgery.  The request was promptly approved, and on August 29, 2018, Naphcare contacted the CRMC Oral Surgery Clinic to schedule the procedure.  King was scheduled to return for the procedure on November 8, 2018 (*Id.* ¶ 18).

On August 29, 2018, NP Weston saw King.  She noted that King had been seen for an offsite appointment, and he needed to have an ORIF of the mandible due to the multiple fractures. King complained of pain, headaches, and difficulty chewing.  NP Weston noted that King was able to open and close his mouth.  (*Id.* ¶ 17).  NP Weston also observed some tenderness at the angle of King's left and right mandible.  There was no obvious bruising or swelling.  NP Weston's assessments were pain and a fractured mandible.  She prescribed Tylenol #3, twice a day, for 14 days.  She advised King to continue a soft diet and to avoid chewing hard foods.  (*Id.*)

6

King submitted another medical request on October 1, 2018.  (*Id.* ¶ 19).  King complained of a "severe broken jaw," and claimed that he needed surgery "yesterday!"  King feared that if the injury healed improperly, it would affect him for life.  In addition, King noted "meds suck."  On the same day King received a response to his medical request.  The response stated that he is already scheduled for surgery and that "[w]e do not dictate when the surgeon chooses to schedule your surgery. We request the appointment [,] and they tell us when they want to do the surgery." (*Id.*).

On October 2, 2018, King once again presented to NP Weston with a complaint of jaw pain.  King noted that the pain developed into lower left dental pain due to a split in his gums.  King reported that he had an exposed nerve and experienced sharp shooting pain whenever he ate, drank, or breathed cold air.  (*Id.* ¶ 20).  NP Weston noted that King's left gumline was displaced with an obvious abnormality.  There was no swelling, drainage, or erythema (reddening).  NP Weston noted tenderness to palpation of the jaw bilaterally and that King was able to open and close his jaw without difficulty.  (*Id.*)  NP Weston assessed a mandible fracture and dental pain due to a secondary fracture.  She prescribed viscous lidocaine mouthwash and tramadol.

On October 25, 2018, King submitted another medical request.  (*Id.* ¶ 22).  He complained of pain from an exposed nerve in the gums where his jaw split. King reported that he had an ongoing fracture "that you guys have neglected to provide surgery for."  (*Id.*).  He noted that he had been advised to see a dentist for the split gums and "that's never happened either!" He asked to see a dentist.  (*Id.*).

King presented to Dr. Meha Kapadia ("Dr. Kapadia"), the facility dentist, on October 28, 2018.  King complained that he had come to the jail with a fracture in his lower jaw four months prior, and nothing had been about it.  Dr. Kapadia noted that King's pain was "0."  He reviewed King's records from Adventist Medical Center Hanford and noted that King was supposed to be referred to an oral surgeon at CRMC for a follow-up.  (*Id.* ¶ 23).  Dr. Kapadia completed a request for specialist consultation, asking that King be seen by an oral surgeon on an "urgent" basis.

On November 2, 2018, King presented to Dr. Siddiqi for a follow-up.  (*Id.* ¶ 25).  Dr.

1   Siddiqi noted that King had a history of a mandible fracture and was seen at the CRMC Oral

2   Surgery Clinic on August 27, 2018.  He noted "ORIF was recommended, waiting."  Dr. Siddiqi

3   reviewed King's medical records, he assessed him with hypertension and that he needed to have

4   ORIF.  The plan was for King to receive an offsite consultation, and to continue ibuprofen and

5   lidocaine viscous mouthwash.  (*Id*.).

6          King was seen at the CRMC Oral Surgery Clinic as scheduled on November 8, 2018, by

7   physician assistant Brady Angiulli and Dr. Robert Julian, an oral surgeon.  (*Id*. ⁋ 26).  Angiulli

8   noted that "Occlusion appears good [,] but teeth come in slight contact first at left premolars.

9   Slight step off to the left parasymphysis between incisors and canine.  Good ROM [range of

10  motion] of TMJ [temporomandibular joint] without trismus.  Bite appears midline." (*Id*.).

11  Angiulli noted that "[d]ue to being healed and occlusion is adequate no surgical intervention at

12  this time as risks don't outweigh benefits…." Angiulli recommended a bite adjustment via

13  dentistry, and Dr. Julian agreed with Angiulli.  (*Id*.).

14         On November 14, 2018, NP Weston saw King for follow-up after the evaluation at the

15  CRMC Oral Surgery Clinic.  NP Weston noted that according to the CRMC Oral Surgery Clinic,

16  King did not need surgical intervention at that time.  King reported continued pain whenever he

17  moved his jaw.  King also reported that he could feel his jaw shift whenever he was exercising or

18  doing anything strenuous.  (*Id*. ⁋ 27).  Additionally, he complained about having an exposed

19  nerve and split gum in the lower left front of his mouth.  King stated that he wanted to exhaust all

20  his alternatives before proceeding with a lawsuit. (*Id*.).

21         NP Weston also noticed a fissure in King's left lower gum without any signs or symptoms

22  of infection.  King was able to open and close his mouth.  NP Weston's assessments were

23  "fractured mandible – healed without surgical intervention," jaw pain, dental pain secondary to

24  fracture, and hypertension.  The plan was for King to be referred to an oral surgeon for a bite

25  adjustment, and then to be seen by a dentist. (*Id*.  ⁋ 28).  Additionally, King was prescribed

26  ibuprofen, chlorhexidine mouthwash, and lisinopril.  (*Id*.).

27         During the November 14, 2018, follow-up, NP Weston completed an offsite healthcare

28  authorization and requested a consultation with an oral surgeon "ASAP" due to the observed bite

abnormalities secondary to a fractured jaw.  King was scheduled for an appointment at Western Dental and Orthodontics on November 26, 2018.  (*Id.* ¶ 29).  On that date, an unidentified provider at Western Dental noted that King needed to see a prosthodontist.  (*Id.* ¶ 30).

On December 13, 2018, King presented to an oral surgeon, Dr. Spencer Anderson ("Dr. Anderson").  (*Id.* ¶ 34).  Dr. Anderson reviewed a cone beam CT scan which was performed in his office that day. Dr. Anderson noted that King's mandible was in proper alignment and the bony union "had indeed transpired at both the ramus and parasymphyseal fractures."  (*Id.* ¶ 36).  Dr. Anderson's assessment was "healed mandible fractures requiring no further treatment."  He recommended an orthodontic evaluation as well as treatment by a dentist for King's missing teeth. Finally, Dr. Anderson noted, "no surgical intervention is recommended."  (*Id.* ¶ 36).

On January 31, 2019, King presented to an orthodontist, Dr. Todd Wesslen.  (*Id.* ¶ 37).  Dr. Wesslen noted that "[t]he case likely needs to be seen by OMFS and if in fact the jaw fracture has not healed, it needs to be set and potentially a bone graft placed."  (*Id.*)  Dr. Wesslen later spoke to Dr. Anderson by phone on February 12, 2019.  (*Id.* ¶ 38).  Following his conversation with Dr. Anderson, Dr. Wesslen thought that no oral surgery was needed.  (*Id.*)

King's retained obstetrician/gynecologist for this litigation, Dr. Paul Sinkhorn, attests that based on the records he reviewed, there was no evidence of intent to harm by Dr. Siddiqi and NP Weston.  (*Id.* ¶ 46).  He also testified that there was no evidence of reckless conduct by Dr. Siddiqi or NP Weston.  Dr. Sinkhorn opined that Dr. Siddiqi and NP Weston should have advocated "to actively attempt a more rapid consultation."  (*Id.*)

King also retained Dr. Christopher French, an oral surgeon.  Dr. French testified at his deposition in this case that, based on the records he reviewed, there was no evidence of malice by Dr. Siddiqi or NP Weston.  Dr. French believed it was "reckless" for Dr. Siddiqi and NP Weston not to ensure King was seen by an oral surgeon within three to five days, as recommended by the emergency department physician when King was discharged from the hospital on the day he sustained his injuries.  Dr. French opined that the standard of care permitted King to undergo surgery up to two weeks after his injury. (*Id.* ¶ 49).

Kyria Martinez, the Rule 30(b)(6) representative of Kings County, testified about the

1   healthcare services provided by Naphcare to the Kings County Jail during the relevant period.

2   She also testified about Naphcare's expenditure for off-site care of inmates and that the cost

3   incurred for offsite care approved by Naphcare kept increasing, both before and after King was

4   treated.  Kings County was not aware of any circumstances where Naphcare sought to save

5   money by delaying off-site care.  (*Id.* ⁋ 51)

6          Defendants retained two experts who offered opinions about the applicable standard of

7   care: Dr. Alfred Joshua, a board-certified emergency medicine physician who specializes in

8   correctional medicine, and Dr. Alan Shelhamer, an oral surgeon.  (*Id.* ⁋ 52).  Both Drs. Joshua

9   and Shelhamer opined that the care King received was appropriate and within the applicable

10  standard of care.  Drs. Joshua and Shelhamer also noted that it was appropriate for Dr. Siddiqi

11  and NP Weston to defer to the CRMC Oral Surgery Clinic as to the timing of care for King's jaw

12  fractures.  (*Id.*).

13         Defendants also retained Dr. David Hatcher, who opined that the manner in which King's

14  fractures healed, in terms of realignment of the jaw, was as good as individuals who received

15  surgical treatment.  (*Id.* ⁋ 53).

16  **B.      Plaintiff's Alleged Facts**

17         In addition to the parties' JSUF, King relies on his own Statement of Undisputed Facts.

18  (ECF No. 62-2, "PSUF").[2]

19         King asserts that during the relevant period, Naphcare's Continuity and Coordination of

20  Care Policy required that all recommendations from specialty appointments be acted upon in a

21  timely manner.  If there is any deviation from the indicated treatment, then clinical justification

22  for the alternative treatment will be documented in the chart and discussed with the patient.

23  (PSUF [19]).  Neither Dr. Siddiqi, NP Weston, nor anyone else documented justification for any

24  "change" or "deviation" from the treatment plan set forth in the emergency department's

25  discharge instructions for King (to follow-up for oral surgery within four to five days) or

26  discussed any alternative treatment with King.  (*Id.* [12], [21], [23]).

27  _____

28          [2] Citations herein to the PSUF refer to the column number associated with the fact
    asserted.

10

1    In addition, during the relevant period, Naphcare had a dental care policy to provide "an

2    immediate referral to the dentist" when visual observation of the teeth and gums results in

3    notation of an obvious or gross abnormality.  (*Id*. [36]).

4    Dr. Siddiqi had noted obvious abnormalities on King's jaw when he examined him on

5    July 14, 2018, but he never referred him to the dentist. (*Id*. [37]).  Dr. Siddiqi knew that King's

6    jaw fracture needed to be treated as soon as possible as bones heal within four to six weeks

7    regardless of their alignment.  (*Id*. [45]).

8    Naphcare's dental care policy also provided that patients with at least moderate dental

9    pain were to be coded "priority" (as opposed to "routine"), and "should be" treated within seven

10   days.  (*Id.* [24], citing Ricketts Decl., ECF No. 62-5, p. 6).[3]  A knocked-out tooth is a situation

11   which causes moderate pain which triggers the seven-day treatment period. (*Id*. [25]).  Dr. Siddiqi

12   and NP Weston both knew that King had at least moderate dental pain. (*Id*. [27], [158]).

13   King was placed on a liquid diet for his first ten days at Kings County Jail. (*Id*. [28]).  NP

14   Weston then placed King on a mechanical soft diet, but King could not eat the food served.  King

15   complained about his food situation to no avail.[4]  King resorted to eating mashed-up packets of

16   ramen to feed himself.  (*Id*. [29]).  NP Weston noted that King was experiencing "sharp shooting

17   pain" with "any eating, drinking or breathing in cold air."  (*Id*. [86]).  Nevertheless, NP Weston

18   made no effort to ensure that King would receive treatment within seven days.  Under Naphcare's

19   "Healthcare Access and Information Policy" at the time, Naphcare providers are not supposed to

20   permit unreasonable delays before patients are seen by offsite providers to address their serious

21   medical needs.  (*Id*. [41]).

22   Dr. Siddiqi had the ability to set an alert for offsite care that needed to happen, but he

23   
24       [3] Although King asserts that the seven-day treatment period under the policy is a
requirement, the policy sets forth that priority-coded inmates "should" receive treatment within
seven days.

25   
26       [4] King relies exclusively on his own declaration filed in support of his summary judgment
motion for the proposition that he complained about being put on a soft diet.  He does not identify
to whom he complained and he does not cite any medical records that document any such
27   complaint.  Defendants dispute King's assertion based on an attending nurse's observation three
days after King was switched to a soft diet that he was able to swallow and eat meals without
28   complications.  *See* Def. Opp. to PSUF (ECF No. 66-3) at p. 15 (citing JSUF ¶ 9).

1  made no effort to check whether his urgent oral surgery consult plan had been followed.  (*Id.* [51-

2  52]).

3      When King saw Dr. Siddiqi on December 14, 2018, he complained to Dr. Siddiqi that he

4  had been told by the OMFS Oral Surgery Clinic that since he had waited too long, he cannot have

5  surgery.  Dr. Siddiqi told King that Naphcare did what it needed to do, and nothing further would

6  be done.  (*Id.* [58]).  NP Weston knew the risks related to not getting prompt surgery on broken

7  bones and that King needed to be seen by a specialist.  NP Weston knew the seriousness of his

8  situation as she repeatedly viewed his patient chart throughout July and August 2018.  (*Id.* [77]).

9      NP Weston learned on August 28, 2018, that King had three jaw fractures and that the

10  OMFS clinic recommended surgery to address his jaw fractures "ASAP."  NP Weston requested

11  offsite approval for the surgery, noting the recommendation that the surgery be accomplished

12  ASAP and was scheduled for November 8, 2018, which was over two months later.  (*Id.* [83]).

13      Dr. Siddiqi had the ability to send King to the emergency room at any time for immediate

14  care.  (*Id.* [59]).  In addition, both Dr. Siddiqi and NP Weston had a variety of other alternatives

15  to expedite his care, such as calling to request an advancement or referring King to another oral

16  surgeon. (ECF No. 62, p. 12).[5]

17      That Naphcare knew King's jaw fractures were an urgent concern is demonstrated by the

18  sharp uptick by Naphcare employees' review of King's medical chart.  (*Id.* [111]).[6] NP Weston

19  testified that most of the time, Naphcare's patients do not see specialists within the time frame

20  specified by referring providers. (*Id.* [137]). According to NP Weston, since Naphcare rarely gets

21  patients to recommended specialists for follow-up care within the timeframes specified by the

22  emergency department, she perceived that nothing was unusual in King's case.  (*Id.* [141]).  If NP

23  Weston perceived that a six-week wait was unusual, then she would have referred King to the

24  ───────────────

25      [5] Although King does not cite record evidence that these alternatives were available, Defendants do not reasonably dispute they could be available.

26      [6] In support of this assertion, King references lodged Exhibit 200, which contains an excel

27  spreadsheet documenting approximately 128 "entries" relating to Naphcare employees' views of the chart over a period of approximately 12 days.  Defendants do not dispute the entries but

28  dispute that the existence of these entries supports King's assertion.  *See* Def. Opp. to PSUF (ECF No. 66-3) at p. 49.

1  emergency department.  (*Id*. [142]).  Likewise, NP Weston oversaw the cases of other patients

2  who experienced significant delays in offsite appointments for facial and jaw fractures. (*E.g*.,

3  Ricketts Decl., Ex. L, ECF No. 62-6, p. 244).

4       On December 6, 2018, King was seen by Aguilar.  (*Id*. [138]).  Aguilar told him that he

5  did not get his surgery because Naphcare does not want to provide patients with offsite care.

6  Aguilar also told King that Naphcare intentionally delays these procedures in hopes that the

7  patient will be bailed out, released, or transferred to prison before the procedure can be done.  (*Id.*

8  [139]).  Aguilar referred King to a law firm so that he could get legal assistance with this case,

9  stating that he had been referred by Aguilar.  (*Id*. [140]).

10       Naphcare has no policy requiring providers to treat comminuted fractures. (*Id*. [163]).  In

11  addition, if Naphcare makes an appointment with an outside specialist, it does not question the

12  appointment date of those specialists, even if there is a lengthy delay.  Naphcare commonly defers

13  to unacceptable wait times including a three month wait for a broken bone.  (*Id*. at [164]).

14       As a result of Naphcare's delay, King's gumline is permanently uneven.  Due to his

15  injuries, King is unable to have a prosthetic tooth implanted. Additionally, King continues to have

16  pain while chewing.  Those issues would have been prevented if King had received his jaw

17  surgery on time. (PSUF [152]).

18  **C.     Defendants Objections to Plaintiff's Statement of Facts**

19       In response to the PSUF, Defendants filed a 25-page table of evidentiary objections.

20  (ECF No. 69-2).  The objections largely are categorized into relevancy, foundation, hearsay, and

21  "contemporaneous and subsequent conduct" objections.  The Court declines Defendants' request

22  to rule on the relevancy, foundation, and hearsay objections.  "At the summary judgment stage,

23  we do not focus on the admissibility of the evidence's form.  We instead focus on the

24  admissibility of its contents."  *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). *Accord*,

25  *Nevada Dep't of Corr.*, 648 F.3d at 1019; *Carmen*, 237 F.3d at 1031. If the contents of a

26  document are presented in a form that would be admissible at trial, the mere fact that the

27  document itself might be excludable hearsay provides no basis for refusing to consider it on

28  summary judgment.  (*Fraser*, 342 F.3d at 1036-37).

1

**IV.  DISCUSSION**

2

**A.      Deliberate Indifference Claims Against Defendants**

3              The government has an obligation to provide medical care for "those whom it is punishing

4     by incarceration."  *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  A person who is deliberately

5     indifferent to a prisoner's serious medical needs violates the Eighth Amendment's prohibition on

6     cruel and unusual punishment.  (*Id*. at 104).  However, "[m]edical malpractice does not become a

7     constitutional violation merely because the victim is a prisoner.  In order to state a cognizable

8     claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate

9     indifference."  (*Id*. at 106).  Likewise, the same standard applies to pretrial detainees, because

10    even though those claims arise under the due process clause of the Fourteenth Amendment, the

11    Eighth Amendment guarantees provide a minimum standard of care for determining a prisoner's

12    rights as a pretrial detainee, including the prisoner's rights to medical care.  *Russell v. Lumitap*,

13    31 F.4th 729, 738 (9th Cir. 2022).  Under either the Eighth Amendment or the Fourteenth

14    Amendment, a plaintiff must show that prison officials acted with objective "deliberate

15    indifference."  *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1068 (9th Cir. 2016) (en banc).  A

16    pretrial detainee who brings an inadequate medical care claim must show that:

17
18
19
20
21

> (i) The defendant made an intentional decision with respect to the condition under which the plaintiff was confined; (ii) those conditions put the plaintiff at a substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved –making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

22

23     *Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018).  Under the second prong of

24    the test outlined by *Gordon*, a "substantial risk of serious harm" in an inadequate-medical-care

25    context exists if there is a serious medical need and a "failure to treat a prisoner's condition could

26    result in further significant injury or the unnecessary and wanton infliction of pain."  *Peralta v.*

27    *Dillard*, 744 F.3d 1076, 1086 (9th Cir. 2014) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th

28    Cir. 2006)).  Injuries that a reasonable doctor or patient would find important and worthy of

14

1   comment or treatment, medical conditions that significantly affect a prisoner's daily activities, or

2   chronic and substantial pain are examples of serious needs for medical treatment. *McGuckin v.*

3   *Smith*, 974 F.2d 1050, 1059-1060 (9th Cir. 1992) (*overruled in part on other grounds by WMX*

4   *Techs. Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997 (en banc)); *Hunt v. Dental Dept.*, 865 F.2d

5   198, 200-01 (9th Cir. 1989).

6          Under the third prong, defendants may be liable even if they did not actually draw the

7   inference that the plaintiff was at a substantial risk of suffering serious harm, so long as a

8   reasonable official in the same circumstances would have drawn that inference. *Russell*, 31 F.4th

9   at 740.  Therefore, under this objective reasonableness standard, the plaintiff must "prove more

10  than negligence but less than subjective intent – something akin to reckless disregard." *Castro*,

11  833 F.3d at 1071.

12                                  * * * * *

13         Although not raised by the parties, King's second cause of action alleging deliberate

14  indifference to King's serious medical needs names as Defendants NP Weston, Dr. Siddiqi, *and*

15  their employer/agent Naphcare, Inc.  *See* Complaint (ECF No. 1) at pp. 18-20.  King's inclusion

16  of Naphcare in this claim does not appear to be a scrivener's error:  the substantive allegations

17  within the claim assert that *Naphcare* "failed to timely send Plaintiff to an oral surgeon,"

18  "conspired … to harm Plaintiff," and undertook actions that were "malicious [and] willful." (*Id.*

19  at ¶¶ 129, 133, 134).  However, in *Monell*, the Supreme Court affirmed that "the doctrine

20  of *respondeat superior* is not a basis for rendering municipalities liable under § 1983 for the

21  constitutional torts of their employees."  436 U.S. at 663 n.7.  Presumably, that is why King

22  named Naphcare in a separate cause of action for municipal and supervisory liability.

23         Because Naphcare may not be sued under the theory of *respondeat superior* on a claim of

24  deliberate indifference to serious medical needs, and instead may be liable under § 1983 only

25  consistent with *Monell*, the Court will grant Defendants' motion to the extent of dismissing

26  Naphcare from King's second claim for relief (King's separate claim against Naphcare under

27  *Monell* municipal and supervisory liability is addressed below).

28  / / /

1          **1.  Whether Dr. Siddiqi and NP Weston Made an Intentional Decision**

2          Defendants assert the first prong of the *Gordon* test cannot be satisfied because NP

3    Weston and Dr. Siddiqi both made timely referrals to the CRMC Oral Surgery Clinic and, thus,

4    were not the cause of King's injury.  (JSUF ⁋ 4; ECF No. 61-5, p. 33).  According to Defendants,

5    the timing of King's appointment was the decision of the CRMC Oral Surgery Clinic, not the

6    Defendants.  Defendants also point to evidence that the CRMC Oral Surgery Clinic's "physician

7    team" was aware of King's fractures and that his appointment was scheduled at a time based on

8    the physician team's consideration of King's circumstances. (JSUF ⁋ 7, ECF No. 61-8, p. 34).

9          In addition, Defendants' retained experts (Drs. Joshua and Shelhamer) opined that it was

10   appropriate for Dr. Siddiqi and NP Weston to defer to the CRMC Oral Surgery Clinic as to the

11   timing of care for King's jaw fractures.  (ECF No. 61-9, pp. 8, 14-16).  Drs. Joshua and

12   Shelhamer noted that there was no need to send Plaintiff to an emergency department because his

13   condition was not urgent.  In essence, Defendants argue that they did not make an intentional

14   decision because their responsibility to ensure King received timely medical care ended once they

15   made the referral to the CRMC Oral Surgery Clinic.  Alternatively, Defendants argue that since

16   King's injury was not urgent, Dr. Siddiqi and NP Weston made the correct decision to defer to the

17   CRMC Oral Surgery Clinic.

18         However, other record facts undermine Defendants' arguments.  NP Weston testified that

19   she considers it part of her role to challenge orders that she knew were not right.  (ECF No. 65-6,

20   p. 54).  Likewise, Dr. Siddiqi conceded that, under some circumstances, he is obligated to follow-

21   up after submitting an offsite referral:

22              Q.  And so even if you write the request, write the referral, give it to
                the right person, you can't just wash your hands of it and say, Well,
23              I put in the request.  You got to follow up and make sure that your
                orders are being carried out, correct?
24
                A.   Correct
25

26   (ECF No. 65-6, p. 118).  In addition, Dr. French, an oral and maxillofacial surgeon retained by

27   King, opined that the treatment King received fell below the applicable standard of care for

28   providing treatment in a timely manner, which "led to months of undue pain … causing difficulty

chewing."  (Ricketts Decl, Ex. K, ECF No. 62-6).  In his deposition, Dr. French stated that he believed that Dr. Siddiqi and NP Weston acted recklessly by not taking additional steps to ensure King was seen by a specialist within three to five days. (JSUF ¶ 49).  Based on this, a reasonable juror could find that NP Weston and Dr. Siddiqi both made an intentional decision regarding King's surgery referral.

The factfinder could also conclude that NP Weston and Dr. Siddiqi could not reasonably defer to the scheduled appointment date set by the CRMC Oral Surgery Clinic.  The evidence summarized above plausibly suggests that Defendants made an intentional decision concerning the conditions under which King was confined – specifically, their decision not to follow-up and inquire whether an offsite appointment could be scheduled within the time recommended by the emergency department physician.  Over time, Defendants repeatedly observed and noted King's continued distressed state and pain, but deliberately chose not to take action in response.  Nothing more than that intentional decision to refrain from acting is required, as the Ninth Circuit made clear in *Jett*.  There, the prison doctor recognized the plaintiff's need to see a specialist (in that case, an orthopedist), as evidenced by the prison doctor's own referral, but the plaintiff was not taken to see the specialist for at least six months. *Jett*, 439 F.3d at 1097–98. The Court concluded that a trier of fact could find that the doctor was aware of the plaintiff's need for treatment and that the doctor's "failure to see [the plaintiff] to ensure [administration of the prescribed treatment] was deliberate indifference to a serious medical condition." *Id.  See Castro,* 833 F.3d at 1070 (a failure to act with respect to a known condition may constitute an intentional decision); *Scalia v. County of Kern*, 493 F. Supp.3d 890, 899 (E.D. Cal. 2019) (denying defendants' motion for summary judgment, in part because there were "factual disputes regarding Nurse Blakely's intentional decisions to not act during both of her examinations, such as deciding to not call a physician nor perform a formal neurological assessment").

The facts and authority cited above demonstrate that a health provider's responsibilities require critical thinking and advocacy for the best health outcomes.  Just as it may not be enough to defer to doctor's orders in a degrading medical situation (as in *Jett*, *supra*), a reasonable jury may conclude that it was medically unacceptable for NP Weston and Dr. Siddiqi to defer to the

1   CRMC's Oral Surgery Clinic's appointment date when they knew that King had an urgent

2   condition.

3       **2. Whether NP Weston's and Dr. Siddiqi's Decision Placed King in a Substantial**

4       **Risk of Serious Harm.**

5       Defendants claim that no act or omission by Dr. Siddiqi or NP Weston placed King at risk

6   of suffering serious harm.  They point to Dr. Shelhamer's review of King's medical records and

7   his opinion that King's jaw fractures were amenable to treatment with a soft diet, and no chewing

8   for a while.  (ECF No. 61-9, p. 13).  According to Dr. Shelhamer, King was able to eat, drink and

9   speak, and his pain was well managed.  (*Id.*)  Dr. Shelhamer adds: "There was nothing urgent or

10  emergent about Mr. King's condition while [he] was waiting to be seen by an oral surgeon."  (*Id.*

11  at 14).  Defendants also point to Dr. French's deposition testimony:

12          Q. Okay. Did any action by Dr. Siddiqi place Mr. King at a high risk
            of suffering serious harm?
13
            A. What would you describe as serious harm?
14
            A. To me, serious harm would be death or grave bodily injury
15
            Q. Okay
16
            A. So no
17

18   (ECF No. 61-10. p. 15).  But Dr. Shelhamer and Dr. Siddiqi's subjective assessment of the

19  severity of King's condition is qualitatively distinct from the legal standard under *Gordon's*

20  second element – the existence of a "substantial risk of suffering serious harm."  Injuries that a

21  reasonable doctor would find important and worthy of comment or treatment, medical conditions

22  that significantly affect a prisoner's daily activities or a chronic and substantial pain are examples

23  of a serious need for medical treatment.  *McGuckin*, 974 F.2d at 1059-1060.  Here, although the

24  evidence is disputed, there are record facts indicating that King repeatedly complained of

25  experiencing pain, fearing an exposed nerve in his mouth, suffering lockjaw and being unable to

26  chew.

27       Additionally, King's medical record reveals that his injuries were consistently treated as

28  urgent by Defendants. Dr. Siddiqi was asked as follows in his deposition:

18

Q. . . .at the time that you referred Mr. King out to be seen by an oral surgeon, it was your expectation that he was going to be seen on an urgent basis, that's why you made it an urgent request, correct?

A.      Correct.

(ECF No. 65-6, p. 116). Likewise, NP Weston answered as follows during her deposition:

Q .. . . You don't agree that Mr. King needed to see an oral surgeon on an urgent basis; correct?

A. I – Yes.  He did need to see an oral surgeon.

Q.  And he needed to see the oral surgeon on an urgent basis; correct?

A. Correct

(ECF No. 65-6, p. 47).  A reasonable jury could find that chewing is an important daily activity that would be gravely impacted by untreated injuries to a person's jaw. In sum, there is enough conflicting evidence in the record – whether the expert witnesses' divergent opinions or Dr. Siddiqi and NP Weston's own deposition testimony – that determining whether Defendants' inaction or mistreatment of King substantially risked causing him serious harm is a triable issue not suitable for resolution on summary judgment.

**3-4. Whether Defendants Took Reasonable Available Measures to Abate or Reduce the Risk of Serious Harm and Whether Such Harm did Result.**

Naphcare's "Continuity and Coordination of Care During Incarceration" policy document sets out:

Naphcare will ensure that appropriate access to hospital and specialist care is made available when necessary and within the clinically indicated timeframe. It is required that inmates in need of health care beyond facility resources, as determined by the responsible physician, to be transferred under appropriate security provisions to a facility where such care is available.

(Ricketts Decl, Ex. 13, ECF No. 65-5 p. 12).  Likewise, Naphcare's Dental Health Care policy provides that whenever obvious or gross abnormality in a patient's teeth or gums is observed, a dentist should be immediately referred.  Inmates with emergent or urgent treatment should be prioritized. Inmates who are in moderate or chronic pain should receive treatment within seven days.  (*Id.* at 6).

These documents demonstrate that Naphcare has developed reasonable available measures

19

1   that may have been pursued to mitigate King's risk of harm.  A reasonable jury could conclude

2   that Defendants not only had reasonable measures available, but also were required to take action

3   to ensure that such harm would not transpire.  *See McGuckin*, 974 F.2d at 1060 (holding that

4   deliberate indifference claim resting on "mere delay of surgery" can survive if the denial caused

5   harm); *Egberto v. Nevada Dep't of Corr.*, 678 F. App'x 500, 504 (9th Cir. 2017) (reversing grant

6   of summary judgment on deliberate indifference claim because a factfinder could infer that at

7   least some of plaintiff's deteriorated physical condition occurred while he was waiting to receive

8   an MRI); *Peralta*, 744 F.3d at 1086 (noting that for purposes of establishing a serious medical

9   need, a three month delay in providing care could create a genuine issue of material fact); *Brown*

10  *v. County of Mariposa*, No. 1:18-cv-01541-LJO-SAB, 2019 WL 1993990, at *4 (E.D. Cal. May

11  6, 2019) (finding that broken bones in a plaintiff's face and shoulder that went without surgery for

12  months which resulted in improper healing alleged a serious medical need).

13        Dr. French, an oral and maxillofacial surgeon, opined that because of the delay, King has

14  had months of undue pain associated with the fractures. (Ricketts Decl, Ex. K, ECF No. 65-6, p.

15  238).  Dr. French further believes that if Mr. King had been treated in a timely manner, "it is more

16  likely than not" that eight weeks after the surgical repair, he would not be experiencing pain or

17  chewing dysfunction.  Based on legal authority (discussed above) that treatment delays resulting

18  in harm may satisfy the substantial risk of serious harm element, as well as Dr. French's

19  testimony that the delay did in fact create a preventable harm, King has adequately identified a

20  triable issue of material fact under the third and fourth prong of the *Gordon* test.  To be sure,

21  while a "a difference of medical opinion regarding . . . treatment" does not rise to the level of a

22  constitutional violation, a defendant can still be held liable for actions that were "medically

23  unacceptable under the circumstances." *Toguchi v Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004);

24  *Sandoval*, 985 F.3d at 671. A reasonable jury may find that delaying King's referral to an oral

25  surgeon for more than one month (when the discharge instructions directed a follow-up within

26  days of the incident), and further delay of surgery for more than two months until a point where

27  the "risks [of surgery] don't outweigh the benefits" (JSUF ⁋ 26) was "medically unacceptable."

28  In turn, the factfinder may find that Dr. Siddiqi and NP Weston's acquiescence to the months-

long delay in presenting King for planned surgery and teeth extraction was also unacceptable.

In sum, as there are disputed issues of material fact that prevent this Court from conclusively deciding any of the elements under the *Gordon* analysis, summary judgment is appropriately denied as to King's second cause of action alleging that Defendants were deliberately indifferent to King's serious medical needs under the Fourteenth Amendment and 42 U.S.C § 1983.

**B.    *Monell* Claim Against Defendant Naphcare**

"A municipality may be held liable under § 1983 'when execution of a government's policy or custom, whether made by its lawmakers or by those edicts or acts may be fairly said to represent official policy, inflicts the injury.'" *Burke v. County of Alameda*, 586 F.3d 725, 734 (9th Cir. 2009) (quoting *Monell*, 436 U.S. at 694).  Private entities acting under color of state law are subject to liability under *Monell* to the extent an official policy or custom of the private entity caused a plaintiff's alleged constitutional violation.  *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012).[7]  To establish municipal liability under § 1983, King must show that (1) he was deprived of a constitutional right; (2) Naphcare had a policy or custom; (3) the policy or custom amounted to a deliberate indifference to his constitutional right; and (4) the policy was the moving force behind the constitutional violation.  *Burke*, 586 F.3d at 734.

A policy under *Monell* is "a deliberate choice to follow a course of action ... made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Tsao*, 698 F.3d at 1143 (internal quotations and citation omitted).  The Ninth Circuit recognizes two types of policies under *Monell*.  "A policy of action is one in which the [entity] itself violates someone's constitutional rights, or instructs its employees to do so; a policy of inaction is based on [the entity's] 'failure to implement procedural safeguards to prevent constitutional violations.'" *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014) (quoting *Tsao,* 698 F.3d at 1143).  In "inaction cases," establishing deliberate indifference under *Monell* "requires showing that the defendant 'was on actual or constructive

---

[7] Naphcare does not dispute that it was acting under color of state law.  *See* ECF No. 61-1, pp. 13-18 (challenging *Monell* liability only on the ground that Naphcare had no policy or custom amounting to deliberate indifference).

1   notice that its omission would likely result in a constitutional violation.'"  *Id.* (quoting *Tsao*, 698

2   F.3d at 1145).

3         A custom is "a widespread practice that, although not authorized by written law or express

4   municipal policy, is so permanent and well-settled as to constitute a custom or usage with the

5   force of law." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (internal quotations

6   omitted). The custom must be so "persistent and widespread" that it constitutes a "permanent and

7   well settled" practice.  *Monell*, 436 U.S. at 691 (internal quotation omitted).  "Liability for

8   improper custom may not be predicated on isolated or sporadic incidents; it must be founded

9   upon practices of sufficient duration, frequency and consistency that the conduct has become a

10  traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

11  However, "contemporaneous or subsequent conduct cannot establish a pattern of violations that

12  would provide 'notice to the [local government entity] and the opportunity to conform to

13  constitutional dictates.'" *Connick v. Thompson*, 563 U.S. 51, 63 n.7 (2011).

14        An entity is deliberately indifferent "when the need for more or different action 'is so

15  obvious, and the inadequacy [of the procedure at issue] so likely to result in the violation of

16  constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately

17  indifferent to the need." *Oviatt By and Through Waugh v. Pearce*, 954 F.2d 1470, 1477-78 (9th

18  Cir. 1992) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

19      **1.  Whether any Failure by Dr. Siddiqi or NP Weston Deprived King of his**

20          **Constitutional Rights**

21         The parties dispute whether Dr. Siddiqi and NP Weston's failure to ensure King was

22  timely seen in the CRMC Oral Surgery Clinic amounts to a constitutional violation.  Defendants

23  assert that the applicable standard of care distinguishes between orders and recommendations.

24  They point to Dr. Shelhamer's opinion that instructions from an emergency department are not

25  orders, but instead should be interpreted as recommendations.  (Couchot Decl, Ex. H, ECF No.

26  61-9, p. 14).  Dr. Shelhamer further opines that the timing for an oral surgery should be

27  determined solely by the judgment of the oral surgeon, and the types of injuries that King

28  sustained can be healed through conservative treatment.  Dr. Shelhamer himself routinely

1    receives requests from emergency departments, but in his experience, it is rare that patients like

2    King are seen within a three- or four-week period.  (*Id*., pp. 14-15).

3         Dr. Shelhamer's testimony conflicts with Dr. French's testimony that the standard of care

4    mandates treatment of injuries like King's as soon as possible, but no later than within two weeks

5    of the injury.  (ECF No. 61-9, p. 30).  Dr. Shelhamer's testimony is also at odds with Dr. Siddiqi

6    and NP Weston's own prioritization of the discharge notes when they classified King's injuries as

7    "urgent."  (JSUF ¶¶ 5, 15).

8         The Court disagrees with Defendants' proposition that there is a difference between

9    "orders" and "recommendations."  In *Shapley v. Nevada Bd. of State Prison Commissioners*, the

10   Court found that a prison official's delay in making the plaintiff inmate available for surgery

11   following the *recommendations* of surgery by several physicians presented a viable theory of

12   deliberate medical indifference. 766 F.2d 404, 407 (9th Cir. 1985) (per curiam). The Court

13   summarized relevant issues in the case that could be tried to a jury: "evidentiary issues

14   concerning the delay of surgery, including the extent of [the inmate's] injury, when surgery was

15   recommended, which doctors recommended surgery and their reasons for doing so, whether

16   prison officials were aware of these recommendations, whether the delay was justified, whether it

17   injured plaintiff, and so forth." *Id*.  *Accord*, *Wakefield v. Thompson*, 177 F.3d 1160, 1165 (9th

18   Cir. 1999) (allegations that a prison official ignored the instructions of a plaintiff's treating

19   physician were sufficient to support a claim of deliberate indifference).

20        King presents sufficient evidence to persuade this Court that a triable issue of fact remains

21   on the question of the individual Defendants' deliberate indifference.  The Defendants knew that

22   King's attending physicians had recommend a follow-up surgical consultation and surgery within

23   a relatively short amount of time.  They also knew that the follow-up consultation and later

24   appointment for surgery were scheduled much later than the recommended times – but seemingly

25   did nothing in an attempt to expedite the appointments, despite King's reports of experiencing

26   pain.  Indeed, Naphcare recognized the severity of the issue when it expressed concern King

27   might sue: "Does [King] have any recommendations…besides suing us?  … Have you shown

28   [King] the notes, so he understands we have not blocked anything?  That we are just as frustrated

1   with finding someone with a resolution for him?"  (Ricketts Decl, Ex. 155, ECF No. 62-5).

2      **2.  Whether the Delay Occurred as the Result of a Custom or Policy Adopted by**

3           **Naphcare**

4           King largely frames his theory of Naphcare's *Monell* liability as a policy of inaction.

5   Thus, he characterizes the issue at the outset of his motion for summary judgment as liability

6   based on "a healthcare company's practice of failing to timely address inmates' serious medical

7   needs."  (ECF No. 62, p. 1).  He similarly summarizes the theory in his suggested *Monell* jury

8   instruction as such: "policies are inadequate to handle usual and recurring situations with which

9   Naphcare employees must deal."  (*Id.*, p. 3).

10          Liability for an improper custom must be founded on "practices of sufficient duration,

11  frequency, and consistency that the conduct has become a traditional method of carrying out

12  policy."  *Oyenik v. Corizon Health*, 696 F. App'x. 792, 794 (9th Cir. 2017) (quoting *Trevino*, 99

13  F.3d at 918).  A plaintiff cannot demonstrate the existence of a policy based on a single

14  occurrence of unconstitutional action committed by a non-policymaking employee.  *McDade v.*

15  *West*, 223 F.3d 1135, 1141 (9th Cir. 2000). Likewise, isolated, or sporadic incidents are not

16  sufficient to establish a custom for *Monell* liability.  *Oyenik*, 696 F. App'x. at 794.

17          King asserts that his delayed treatment is symptomatic of Naphcare's broader custom of

18  inaction.  He highlights NP Weston's testimony that, in her experience, Naphcare patients

19  commonly experience delays in appearing for offsite appointments within the referring doctor's

20  recommended timeframe.  (Ricketts Decl., Ex C, ECF 62-6, p. 46).  NP Weston's deposition

21  testimony does not support the proposition that any delays by Naphcare in scheduling patients to

22  see specialists were of unreasonable length, or more importantly, that they caused patients to

23  suffer additional harm with any frequency.  Indeed, NP Weston clarified that, if speedier care

24  were necessary for any particular patient, she would take action, such as by sending the patient to

25  the emergency room. (*Id.*).

26          King also submits his own declaration in which he states a Naphcare registered nurse told

27  him that because his surgery was a costly procedure, Naphcare hoped to delay surgery until he

28  was transferred to a different facility so that it would not incur the expense.  (PSUF ¶¶ 138-39).

24

1    However, in his own deposition, the nurse denied ever making such a statement.   (Couchot Decl.,

2    Ex. T, ECF No. 66-13, p. 5).  *See Villiarimo v. Aloha Island Air., Inc.*, 281 F.3d 1054, 1061 (9th

3    Cir. 2002) (refusing to find a genuine issue where the only evidence presented is "uncorroborated

4    and self-serving" testimony).

5           In addition, King presents a letter from Naphcare to the King's County Office of County

6    Administrator dated March 8, 2019, in which Naphcare reports that it was working closely with

7    the Kings County Jail to "further reduce our offsite send-outs."  (Ricketts Decl., Ex. CC, ECF No.

8    65-6, p. 379). King argues that a jury could infer that Naphcare's efforts to control offsite costs in

9    early-2019 "began in 2018." (ECF 65, p. 19).  The letter supports no such inference –

10   Naphcare acknowledged supporting offsite trips as "appropriate" and incorporating telemedicine

11   for specialty visits.  In all events, Naphcare approved all of King's referrals to offsite specialists;

12   thus, any purported policy by Naphcare of limiting offsite specialty visits did not impact King,

13   who timely was referred to an offsite consultation and subsequent appointment for anticipated

14   surgery.

15          King's principal support for the existence of a policy or custom of delay by Naphcare

16   comes from declarations by and accounts of other inmates he characterizes as having experienced

17   similar delays in treatment, which King argues constitute circumstantial evidence that such delays

18   are customary for Naphcare.  For instance, in a declaration submitted in an unrelated action

19   against Naphcare, Michael Valdez declares that he was injured on January 1, 2016, and received a

20   note stating that he should follow up with an ophthalmologist no later than January 4, 2016.

21   (Ricketts Decl., Ex. H, ECF No. 62-6, pp. 218-22).  Valdez attests that he did not see anyone

22   about his eye until "he complained to" a Naphcare nurse practitioner approximately two weeks

23   later. (*Id.*)  King asserts that the Valdez suit put Naphcare on notice of its potentially

24   unconstitutional conduct, that Naphcare did nothing to remedy the issue, and that Naphcare's

25   unwillingness to improve its processes led to King's constitutional deprivation.  (ECF No.65, p.

26   25).

27          King's proffer of facts concerning Valdez's circumstances is wholly inadequate for this

28   Court to determine whether the incident involved either a policy or custom or deliberate

1    indifference of a constitutional order.  Valdez attests that immediately upon complaining to a

2    Naphcare nurse practitioner about his condition, he was taken to see an optometrist.  Although

3    King complains that Valdez had been referred to see an ophthalmologist (not an optometrist), the

4    Court fails to see how this demonstrates a deliberately indifferent policy by Naphcare.

5    Presumably, an optometrist would be in a better position than the Naphcare nurse practitioner to

6    assess whether Valdez was a candidate for a follow-up with an ophthalmologist.  In short, without

7    additional facts, the Court cannot find that the Valdez example convincingly demonstrates a prior

8    occasion of Naphcare's alleged policy of inaction.[8]

9        King also offers a modified version of a Naphcare spreadsheet that includes certain

10   information relating to the scheduling of offsite care for a "Patient B."  (Ricketts Decl., Ex. L,

11   ECF No. 62-6, p. 244).  Among other things, the spreadsheet purports to memorialize that NP

12   Weston recognized Patient B needed to have an urgent jaw surgery on March 8, 2018.  (*Id.*).  The

13   appointment appears to have been canceled on March 21, 2018, leading NP Weston to note:

14   "[N]eeds to see another oral surgeon ASAP for fractured jaw." Patient B finally received the jaw

15   surgery on May 17, 2018, two months after the urgent need for surgery was identified. (*Id.*)

16       Once again, it might be the case that Patient B suffered harm as the result of a deliberately

17   indifferent policy of inaction by Naphcare.  But the Court can draw no such conclusion from what

18   King presents in connection with Patient B – seven rows from a Naphcare spreadsheet

19   documenting truncated comments from a nurse practitioner without context or details.

20       Other examples provided by King in support of his assertion that Naphcare follows a

21   policy or practice of indifference – Patients "D"," F"," G"," L", "I" and a declaration from

22   prisoner Geordie Carrillo – are even less compelling. (Ricketts Decl., Exs. L & I, ECF No. 62-6,

23   p. 244).  For instance, NP Weston documented that Patient D needed oral surgery for

24   "[c]omminuted fx of anterior and lateral wall of left maxillary sinus [n]eeds OMFS evaluation."

25

26       [8] The Court is unable to locate any additional facts about Valdez's circumstances that
     might inform the Court's assessment in this regard because Naphcare was dismissed from
27   Valdez's lawsuit on the grounds that Valdez failed to plead that Naphcare adhered to any policies
     demonstrating deliberate indifference. *See Valdez v. County of Kings*, No. 1:17-cv-00430-LJO-
28   SAB (E.D. Cal.), Doc. 120 (Aug. 30, 2019).

(*Id.*).  However, the record entry lists the priority as "routine," and, thus, Patient D is not an analogous situation in which a reasonable fact finder could infer of a custom of delay relating to procedures recommended on an urgent basis.  The remaining anonymous patients and Geordie Carrillo all were seen by Naphcare either contemporaneously with King or after he entered their care.  Such examples of purported contemporaneous or subsequent deliberate indifference are incapable of demonstrating a pattern of violations that would provide notice to Naphcare and the opportunity for it to conform to constitutional dictates. *Connick*, 563 U.S. at 63 n.7.  *See Estate of Mendez v. City of Ceres*, 390 F. Supp.3d 1189, 1209-11 (E.D. Cal. 2019) (reviewing timing and likeness of proffered examples of municipality's alleged inaction and finding they were too disparate to constitute a pattern sufficient under *Monell*).

Setting aside the infirmities of the examples noted above that undermines their utility in weighing whether Naphcare had adequate notice of a constitutionally defective policy of inaction, only the cases of Valdez and Patient B present possible *prior* examples of deliberate indifference. That is insufficient to establish a practice or custom under *Monell*.  *See, e.g.*,  *Trevino*, 99 F.3d at 918 (two incidents are not enough to establish custom); *Meehan v. City of Los Angeles*, 856 F.2d 102, 107 (9th Cir. 1988) (same).

Because there is no disputed issue of material fact as to whether any deliberate indifference by Defendants towards King was the result of any Naphcare policy or custom, summary judgment dismissing King's fourth cause of action asserting a claim against Naphcare for municipal and supervisory liability under *Monell* is appropriate.  As King fails to present any triable issues of fact on this element, he likewise cannot establish under *Monell* that any policy or custom was the "moving force" behind any deprivation of his constitutional rights.  *See Celotex Corp.*, 477 U.S. at 332 ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

## V.  CONCLUSION AND ORDER

For the foregoing reasons, Plaintiff Barry King's motion for summary judgment is DENIED in its entirety and Defendants' motion for summary judgment is GRANTED in part and DENIED in part, as follows:

1    (1)  Defendants' motion for summary judgment on King's second cause of action alleging

2    that Defendants Nurse Practitioner Robynn Weston, Dr. Naeem Siddiqi, and their employer/agent

3    Naphcare, Inc., were deliberately indifferent to King's serious medical needs under the

4    Fourteenth Amendment and 42 U.S.C § 1983 is GRANTED as to Naphcare and DENIED as to

5    NP Weston and Dr. Siddiqi; and

6    (2)  Defendants' motion for summary judgment on King's fourth cause of action asserting

7    a claim against Naphcare for municipal and supervisory liability under *Monell* is GRANTED.

8

9    IT IS ORDERED that the parties SHALL appear for a status conference on May 9, 2023,

10   at 10:30 a.m.  The parties may appear at the status conference via Zoom, details for which the

11   parties may request from Courtroom Deputy Susan Hall (shall@caed.uscourts.gov).  In advance

12   of the status conference, the parties SHALL meet and confer about further scheduling of the case

13   and be prepared to identify to the Court dates of mutual availability for pretrial conference and

14   trial.  The parties also are encouraged to discuss settlement and be prepared to address whether

15   they request the Court schedule a settlement conference before an unassigned magistrate judge.

16   IT IS SO ORDERED.

17   Dated:   **April 14, 2023**

18                                                                UNITED STATES MAGISTRATE JUDGE

19

20

21

22

23

24

25

26

27

28